NIHON CEMENT CO., LTD., ET AL., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND THE AD HOC COMMITTEE OF SOUTHERN CALIFORNIA PRODUCERS OF GRAY PORTLAND CEMENT, ET AL., DEFENDANT-INTERVENORS

Consolidated Court No. 91–06–00425

(Dated May 25, 1993)

*Akin, Gump, Hauer & Feld, (Patrick F.J. Macrory, Spencer S. Griffith* and *Robert W. Aulsebrook)* for plaintiff Onoda Cement Co., Ltd. and defendant-intervenor Onoda Cement Co., Ltd.

*Kilpatrick & Cody, (Joseph W. Dorn, Martin M. McNerney, Gregory C. Dorris* and *Damon V. Pike)* for plaintiff The Ad Hoc Committee of Southern California Producers of Gray Portland Cement and defendant-intervenor The Ad Hoc Committee of Southern California Producers of Gray Portland Cement.

*Graham & James, (Yoshihiro Saito* and *Brian E. McGill)* for plaintiff Nihon Cement Co., Ltd.

*Stuart M. Gerson, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Jeffrey M. Telep); Stephen J. Claeys, Attorney-Advisor, Office of the Chief Counsel for Import, Department of Commerce, of counsel,* for defendant.

### MEMORANDUM OPINION

GOLDBERG, *Judge:* Plaintiffs Nihon Cement Co., Ltd. ("Nihon"), Onoda Cement Co., Ltd. ("Onoda") and The Ad Hoc Committee of

Southern California Producers of Gray Portland Cement ("Ad Hoc") bring this consolidated action challenging the final determination of the United States Department of Commerce, International Trade Administration ("Commerce"), in *Gray Portland Cement and Clinker from Japan,* 56 Fed. Reg. 12156 (Dep't Comm. 1991) (final determination), as amended by *Gray Portland Cement and Clinker From Japan,* 56 Fed. Reg. 21658 (Dep't Comm. 1991) (antidumping duty order). Plaintiffs argue that Commerce's determination is not supported by substantial evidence contained in the administrative record and is not in accordance with the law.

Defendant argues that the motions for judgment upon the administrative record and remand should be denied and Commerce's determination should be sustained, except for one aspect of Commerce's calculation of Onoda's United States price. Commerce concedes that it incorrectly deducted all of Lone Star Northwest's corporate general and administrative expenses ("G&A") as selling expenses. Commerce requests that the calculation of Onoda's United States price be remanded to the agency for recalculation.

Commerce claims that its determination is otherwise supported by substantial evidence contained in the administrative record and is in accordance with the law.

Plaintiffs Ad Hoc and Onoda also participated as defendant-intervenors.

The court has jurisdiction under 28 U.S.C. § 1581(e) (1988).

The court sustains Commerce's determination in part. The court finds that Commerce's determination, in part, was not based upon substantial evidence and was not in accordance with the law, and remands to Commerce as to those relevant parts.

## BACKGROUND

Plaintiff Ad Hoc filed an antidumping duty petition with Commerce and the United States International Trade Commission ("Commission") on May 18, 1990. The petition alleged that imports of gray portland cement and cement clinker ("cement and clinker") from Japan were being sold in the United States at less than fair value, and that an industry in the United States was materially injured or threatened with material injury by reason of the imports.

On June 15, 1990, Commerce published a notice of initiation of a less-than-fair value investigation covering imports of gray portland cement from Japan regarding the period December 1, 1989 through May 31, 1990. *Gray Portland Cement (Including Cement Clinker) from Japan,* 55 Fed. Reg. 24,295 (1990) (initiation of investigation).

Although Commerce's notice of initiation requested that interested parties notify Commerce of support for or opposition to the petition, no timely challenges to petitioners' standing to file the petition on behalf of the industry were filed.

Gray portland cement, the merchandise under investigation, is a hydraulic cement and sets under water. It is the primary component of concrete which is one of the principal building and construction materials used in the United States. It is also widely used in Japan in construction and public works projects. Clinker, an intermediate material produced when manufacturing cement, has no use other than grinding into finished cement.

Commerce determined that microfine cement was outside the scope of the investigation. Oil well cement was included within the scope of the investigation.

On July 2, 1990, Commerce presented questionnaires to Onoda and Nihon, as respondents, who combined accounted for more than 60 percent of exports by volume to the United States during the period of investigation ("POI").

For both Onoda and Nihon, Commerce compared United States sales of bulk cement to home market sales of bulk cement when investigating whether the imported merchandise was dumped by either respondent. For Onoda, Commerce also compared United States sales of cement, which was further manufactured into ready-mix, to home market sales of bulk cement, and United States sales of clinker to a third country sale of clinker.

Product comparisons between imported cement and cement sold in the Japanese market were made on the basis of standards established by the American Society of Testing Materials ("ASTM") which define the technical and performance specifications for gray portland cement manufactured in the United States. Both imported and domestic gray portland cement conform to ASTM standards. The Japanese Industrial Standards ("JIS") broadly define the technical and performance specifications for gray portland cement manufactured in Japan. The JIS does not use the same nomenclature as the ASTM, and the technical and performance specifications do not coincide precisely with the relevant ASTM specifications. Furthermore, Japanese producers publish technical specifications for their own cement sold in Japan. Public Reels ("P.R.") 1–13[1] (Petition at 22) (JIS R 5210).

All of the cement exported to the United States by the respondents during the POI fell within two ASTM standards. Onoda sold both Type I and Type II cement in the United States; Nihon sold only Type II in the United States. Both respondents sold at least three types of cement in the home market during the POI: ordinary portland cement ("NC"), moderate heat cement ("MC"), and high early strength cement ("VC"). Both petitioner and respondents agreed that NC was most similar to Type I cement, and Commerce therefore made product comparisons on that basis. After an investigation of the various types of cement pro-

---

[1] The numbers in this citation refer to the stamped numbers of the reels containing the administrative record. The second number refers to the group of reels and the first number refers to the reel number within the group.

duced and sold in the Japanese market, Commerce determined that MC was most similar to Type II for comparison purposes.

To determine whether sales of cement and clinker from Japan to the United States were made at less than fair value, Commerce compared the United States price ("U.S. price") to the foreign market value.

For Onoda, Commerce based U.S. price on purchase price where sales were made directly to unrelated parties prior to importation into the United States, in accordance with 19 U.S.C. § 1677a(b) (1988). Where sales to the first unrelated purchaser took place after importation into the United States, Commerce based the U.S. price on exporter's sales price ("ESP") in accordance with 19 U.S.C. § 1677a(c) (1988). For Nihon, Commerce based U.S. price on purchase price because all sales were made directly to unrelated parties prior to importation into the United States.

For Onoda, Commerce calculated purchase price based on f.o.b. Japanese port prices. In accordance with 19 U.S.C. § 1677a(d) and (e), deductions and additions were made where appropriate.

Onoda's ESP sales were made through a joint venture between Onoda and Lone Star Industries, Inc. ("Lone Star") called Lone Star Northwest ("LSNW"), located in Seattle, Washington. There were other channels of distribution for Onoda cement sold in the United States. Confidential Reels ("C.R.") 4–13.[2] (Onoda's Aug. 20, 1990 Section A Response at 8–10). However, only the cement which passed through LSNW is relevant for the purposes of this opinion.

The record shows that LSNW was created to import Onoda cement. The record also indicates that LSNW was both a manufacturing and selling operation. LSNW used cement imported from Onoda to manufacture ready-mix for sale to unrelated customers, and also resold cement imported from Onoda. P.R. 2–13 (Administrative Hearing Tr. at 40–41).

The record shows that during the POI, there were four channels of distribution for Onoda cement sold through LSNW. First, LSNW sold Onoda cement in bulk to an unrelated cement producer in Washington state. P.R. 2–13 (Administrative Hearing Tr. at 41). Second, LSNW sold ready-mix containing Onoda cement to unrelated customers in Washington. *Id.* Third, LSNW sold Onoda cement to unrelated customers in Oregon state. *Id.* Fourth, LSNW sold ready-mix containing Onoda cement to unrelated customers in Oregon. *Id.*

The record shows that Onoda transported its cement from its Japanese plant to LSNW by ship. The cement was transferred from the ship to terminal facilities in Seattle and Portland before further shipment or processing in the United States. C.R. 4–13 (Onoda's Aug. 20, 1990, Section C Response at 4). Onoda claimed United States terminal costs as movement charges. Based on its findings at verification, Commerce,

---

[2] The numbers in this citation refer to the stamped numbers of the reels containing the administrative record. The second number refers to the group of reels and the first number refers to the reel number within the group.

however, determined that these costs were pre-sale warehousing expenses and, therefore, were more appropriately classified as indirect selling expenses.

Onoda's ESP sales were calculated based on c.i.f. picked up or delivered prices. Commerce then made deductions and additions where appropriate.

For ready-mix sales from LSNW, Commerce deducted all increased value resulting from the further manufacturing performed on the imported merchandise after its importation into the United States, pursuant to 19 U.S.C. § 1677a(e)(3) (1988). This increased value comprised two parts: (1) The costs associated with the production and sale of ready-mix, other than costs associated with the imported merchandise, and (2) a proportional amount of profit or loss related to the increased value. Commerce determined that further manufacturing costs included (1) The costs of manufacture (cost of materials and the related labor and overhead costs), (2) movement charges, and (3) general expenses, including selling, general and administrative expenses and interest expenses.

The record shows that [        ] Lone Star and one of its subsidiaries contributed assets to LSNW consisting of ready mix concrete manufacturing facilities, aggregates, cement terminals, and a building materials distribution operation in Washington, Oregon, and Alaska. This [       ] C.R. 4–13 (Onoda's Aug. 20, 1990, Section C Response at 25).

The record shows that in order to finance the creation of the joint venture, Onoda and Lone Star arranged on [          ] *Id.*

[          .] *Id.*

Commerce included these [        ].

The record also shows that due to the location of the ready-mix plant in the Pacific Northwest, the ready-mix market was subject to seasonal fluctuations. The operation experienced seasonal swings in its level of sales and therefore in its production levels. Consequently, capacity utilization varied substantially between the cold and warm seasons. P.R.2–13 (Administrative Hearing Tr. at 62–65). Based on the information gathered, Commerce annualized LSNW's cost of further manufacturing.

For Nihon, Commerce calculated purchase price based on the f.o.b. Japanese port price. Commerce made deductions and additions where appropriate.

In accordance with 19 U.S.C. § 1677b (1988), Commerce calculated foreign market value for Onoda based on home market prices or third country prices, as appropriate. For Nihon, Commerce calculated foreign market value based on home market sales prices.

For Onoda, Commerce calculated foreign market value of cement sales based on ex-factory, c.&.f. terminal or delivered prices to unrelated and related customers in the home market.

The record shows that Onoda sold cement throughout Japan and that sales were made in a variety of ways. Onoda thus had sales to various

cement producers as well as to its distributors. Onoda also made direct sales to the end-user. C.R. 4–13 (Onoda's Aug. 20, 1990 Section A response at 13–16).

The record shows that cement from Onoda's four Japanese cement production plants was usually shipped by tanker to approximately 95 service stations owned by Onoda and located throughout Japan. The record further indicates that the cement was shipped from the service stations by truck or occasionally by rail to the end-user, or picked up at the service station by truck by the end-user. C.R. 4–13 (Onoda's Aug. 20, 1990 Section A response at 5–6).

For comparisons to purchase price sales, Commerce made deductions where appropriate. Commerce, however, did not make a deduction for home market terminal costs as claimed by Onoda. Based on its findings at verification, Commerce determined that these costs were pre-sale warehousing expenses and, therefore more appropriately classified as indirect selling expenses.

For comparisons to ESP sales, Commerce made further deductions for home market indirect selling expenses, comprised of among other costs, service station costs associated with distribution. Commerce capped the amount deducted from home market indirect selling expenses by the amount of indirect selling expenses incurred on sales in the United States market in accordance with Commerce's regulations. 19 C.F.R. § 353.56(b)(2) (1988). For ESP sales of ready-mix, Commerce computed the amount of the cap based on the portion of indirect selling expenses attributable to the subject merchandise.

For Nihon, Commerce calculated foreign market value based on c.&.f. terminal or delivered prices to related and unrelated customers in the home market.

In its August 27, 1990 questionnaire responses, Nihon reported that it was related to three Japanese cement producers. These were Myojo Cement Co., Ltd., ("Myojo"), Daiichi Cement Co., Ltd. ("Daiichi") and Ryukyu Cement Co., Ltd. ("Ryukyu").

The parties concede that Nihon owned a majority share of stock in Myojo and that Nihon owned a minority share of stock in Ryukyu. They do not, however, agree on what percentage of stock Nihon owned in Daiichi.

The parties concede that the boards of directors of Nihon and Myojo shared members and that Nihon and Daiichi did not. Ryukyu and Nihon also had interlocking directors.

The parties admit that Myojo, Daiichi and Nihon sold their cement through a joint sales company, Daichon Distribution Company. Ryukyu was not in the joint sales company with Daiichi, Myojo and Nihon.

The parties concede that Ryukyu did not have any consignment agreements with Nihon, but that Daiichi and Myojo did.

Commerce collapsed Nihon, Daiichi and Myojo, calculating a single dumping margin for the three entities. For sales made by Daiichi and

Myojo, Commerce based foreign market value on best information available. Deductions were made where appropriate.

The Commission issued its affirmative preliminary determination in July, 1990. *See Gray Portland Cement and Cement Clinker from Japan,* USITC Pub. 2297, Inv. No. 731–TA–461 (Prelim.) (July 1990); also published at 55 Fed. Reg. 28,465 (USITC 1990).

On October 31, 1990, Commerce preliminarily determined that sales of gray portland cement from Japan were being made by Onoda and Nihon at less-than-fair value. *Gray Portland Cement and Clinker from Japan,* 55 Fed. Reg. 45,831 (Dep't Comm. 1990).

During January, 1991, Commerce verified the questionnaire responses of Nihon and Onoda.

The Commission issued a three to one final affirmative determination in April, 1991. *Gray Portland Cement and Cement Clinker from Japan,* USITC Pub. 2376, Inv. No. 731–TA–461 (1991); also published at 56 Fed. Reg. 21,391 (final) (1991), as amended 56 Fed. Reg. 22,053 (1991).

In its final determination, the Commission found that gray portland cement and clinker have a low value-to-weight ratio. P. R. 1–13 (Commission Report at 16–17). Transportation costs were found to be high relative to price. These high transportation costs meant that cement and clinker tend to be produced and marketed locally. *Id.* The Commission found that inventory times are very short due to the fact that storage of hydraulic cement is comparatively expensive. *Id.* at 25.

On March 22, 1991, Commerce published its final determination of sales at less-than-fair value.

On May 10, 1991, following the Commission's final affirmative injury determination, Commerce published an antidumping order covering gray portland cement from Japan, and an amended final determination of sales at less-than-fair value to find 84.70 percent and 45.29 percent weighted-average dumping margins for Nihon and Onoda respectively. For the category "all others", the dumping margin was set at 63.73. *Gray Portland Cement and Clinker from Japan,* 56 Fed. Reg. 21,658 (1991) (antidumping duty order).

Plaintiffs Onoda, Nihon and Ad Hoc each filed separate complaints before this court challenging several aspects of Commerce's determinations. The court consolidated all three actions together on November 4, 1991 under court number 91–06–00425.

Before discussing the contested aspects of Commerce's methodology, the court will dispose of the request by Commerce for remand to determine the appropriate portion of total LSNW G&A expenses to attribute to Channel 3 sales of bulk cement imported from Onoda and sold through the Oregon Division of LSNW. Commerce agrees with Onoda's claim that it erred in deducting LSNW's corporate G&A expenses when calculating the U.S. price for Channel 3 sales. These expenses were incurred to manufacture and to sell cement. Therefore they may not be treated as selling expenses. The court remands this part of the determination to Commerce for recalculation.

DISCUSSION

1. STANDARD OF REVIEW

In challenges to final determinations in antidumping investigations, the type of action under review here, the statute provides that the court must sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

The Supreme Court has stated that the evidence required to support an agency's decision under the substantial evidence standard is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477. The possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Com.,* 383 U.S. 607, 620 (1966). It is not the court's function to decide that it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States,* 3 Fed. Cir. (T) 44, 54, 750 F.2d 927 (1984). The court will affirm Commerce's determination if it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence. *Atlantic Sugar, Ltd. v. United States,* 2 Fed. Cir. (T) 130, 136, 744 F.2d 1556, 1563 (1984). This standard of review accords deference to Commerce's conclusions.

This court is, however, statutorily mandated to review whether Commerce's determination is "otherwise not in accordance with the law". The court must thus determine whether the agency acted within the limits of its statutory mandate. Statutory interpretation begins with the language of the statute itself. "If the intent of Congress is clear [from the language of the statute], that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. National Resources Defense Council Inc.,* 467 U.S. 837, 842–843 (1984) (footnote omitted) ("Chevron"). The "traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Serampore Indus. Pvt., Ltd. v. United States Dept. of Commerce, International Trade Admin.,* 11 CIT 866, 869, 675 F. Supp. 1354 (1987) (quoting *Board of Governors of Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361 (1986)).

It is only "if the statute is silent or ambiguous with respect to the specific issue, [that] the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron* at 843.

II. ISSUES PRESENTED FOR REVIEW

A. *Such or Similar Merchandise:*

The antidumping statute provides that foreign market value should be determined from home market sales of "such or similar" merchan-

dise. 19 U.S.C. § 1677b(a)(1)(A) (1988). "Such or similar" merchandise is defined in 19 U.S.C. § 1677(16) (1988) as:

> * * * merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
>
>> (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>> (B) Merchandise—
>>> (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
>>> (ii) like the merchandise in component material or materials and in the purposes for which used, and
>>> (iii) approximately equal in commercial value to that merchandise.
>> (C) Merchandise—
>>> (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
>>> (ii) like that merchandise in the purposes for which used, and
>>> (iii) which the administering authority determines may reasonably be compared with that merchandise.

The merchandise must meet one of these three tests. According to the provision, the first test is preferred over the second, and the second test is preferred over the third.

The first test is the most stringent because it requires that the product be identical to the product being sold in the United States. The second and third tests are, however, increasingly broad. The second test is threefold and requires an evaluation of component materials, use and value, while the third test gives Commerce wide discretion to determine when products may be reasonably compared based on their use even if materials and value differ.

Plaintiff Ad Hoc objects to Commerce's decision that moderate heat cement sold in Japan is similar to Type II cement sold in the United States within the meaning of Section 1677(16)B.

B. *Adjustment Methodology:*

In an antidumping duty investigation, Commerce is charged with determining whether "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value. * * *" 19 U.S.C. § 1673(1) (1988). Commerce imposes a duty equal to the amount by which the U.S. price of merchandise is less than the foreign market value of the merchandise. 19 U.S.C. § 1673 (1988).

The U.S. price is defined at 19 U.S.C. § 1677a(a) (1988) as "the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate." The provision defines purchase price as:

> the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.

19 U.S.C. § 1677a(b) (1988).

The exporter's sales price is defined as "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e) of this section." 19 U.S.C. § 1677a(c) (1988).

Title 19 of the United States Code, Section 1677b(a)(1) (1988) defines the foreign market value as:

> the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported * * *.
>
> (A) at which such or similar merchandise is sold * * * in the usual commercial quantities and in the ordinary course of trade for home consumption. * * *.

Before comparing the U.S. price with the foreign market value, Commerce makes a number of deductions and adjustments to the prices in the two markets. 19 U.S.C. §§ 1677a–1677b (1988). The role of these adjustments is to account for differences between the foreign market merchandise and the United States merchandise or the circumstances under which they are sold by making additions to or deductions from the observed U.S. price and the observed foreign market price, and in so doing derive prices between which fair comparisons can be made. *Smith-Corona Group v. United States*, 2 Fed. Cir. (T) 60, 713 F.2d 1568 (1983), *cert. denied*, 465 U.S. 1022 (1984). *("Smith-Corona"). See also Zenith Electronics Corporation, v. United States*, No. 92–1043, 92–1044, 92–1045, 92–1046 (Fed. Cir. Mar. 19, 1993) *("Zenith").*

Plaintiffs claim that Commerce made several errors in determining and adjusting the U.S. price and the foreign market value of the cement.

Specifically, plaintiff Ad Hoc objects to Commerce's decision to use annualized fixed costs to calculate LSNW's costs of further manufacturing cement from Onoda because LSNW's fixed costs experienced significant seasonal fluctuations and were significant enough to affect the cost of ready-mix cement.

Ad Hoc objects to Commerce's decision to deduct Onoda's and Nihon's pre-sale movement expenses from the observed price.

Onoda objects to Commerce's treatment of Onoda's costs of operating its service stations that are a part of its distribution system in the

Japanese market as warehousing expenses rather than as movement expenses.

Finally, Onoda objects to Commerce's decision to include the interest paid on all loans by LSNW in calculating LSNW's costs of further manufacturing cement imported from Onoda.

### C. *Use of Best Information Available:*

When a respondent does not supply the information requested by Commerce in a timely manner, or provides incomplete information, the statute and Commerce's regulations allow (and, in certain circumstances, require) Commerce to use information that has not been provided by the respondent in question. Such information is referred to as best information available ("BIA"). The relevant statutory provision provides:

> In making [antidumping duty] determinations [Commerce] shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c) (1988).

Commerce is furthermore required to verify all information used in its final determinations according to 19 U.S.C. § 1677e(b) (1988). The statute provides that Commerce is to use BIA if it is unable to verify the accuracy of the information submitted. According to Commerce's regulations:

> (a) *Use of best information available.* The Secretary may use the best information available whenever the Secretary:
> (1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or
> (2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.
> (b) *What is best information available.* The best information available may include the factual information submitted in support of the petition or subsequently submitted by interested parties, as defined in [the regulation]. If an interested party refuses to provide factual information requested by the Secretary or otherwise impedes the proceeding, the Secretary may take that into account in determining what is the best information available.

19 C.F.R. § 355.37 (1992).

Courts have affirmed Commerce's broad discretion with regard to when the use of BIA is appropriate and what should be used as BIA. *Olympic Adhesives, Inc. v. United States,* 8 Fed. Cir. (T) 69, 899 F.2d 1565, 1571–72 (1990). Commerce's discretion is, however, not unlimited in either respect. Courts have, for example, found Commerce's resort to BIA to be arbitrary and an abuse of discretion where the respondent failed to give information because the information did not and could not exist. *Id.* Commerce must also properly instruct the respondent as to the

information requested. *Daewoo Elect. Co. v. United States,* 13 CIT 253, 266, 712 F. Supp. 931 (1989).

Plaintiff Nihon objects to Commerce's use of BIA based on Nihon's failure to report home market sales for related parties Myojo and Daiichi because Myojo and Daiichi were separate legal entities, and data relating to Myojo and Daiichi was unavailable to it.

### III. ANALYSIS OF THE ISSUES PRESENTED FOR REVIEW

#### A. *Such or Similar Merchandise:*

The court first addresses Ad Hoc's argument that Commerce's decision to compare moderate heat cement sold in Japan to Type II cement sold in the United States was not based on substantial evidence and was not in accordance with the law.

In its final determination, Commerce based its product match on 19 U.S.C. § 1677(16)(B) (1988) which provides that "such or similar" merchandise means:

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like the merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

Commerce concluded that the appropriate product match for United States sales of Type II merchandise was moderate heat cement. In its determination, Commerce stated that:

[t]he statute directs the Department to select the most similar product match in terms of materials and use, among other criteria (section 771(16)(ii) of the Act). * * * The key to proper analysis under section 771(16)(B)(ii) is identification of the properties a U.S. contractor desires when requesting Type II cement.

56 Fed. Reg. 12156, 12160

Plaintiff Ad Hoc contends that Commerce erred in comparing Type II cement to moderate heat cement. Commerce also erred in its determination because it only cited to § 1677(16)(8)(ii) (1988). Section 1677(16)(B)(ii) covers similarities in characteristics and uses between the home market and exported products. Plaintiff points out that Commerce's final determination contains no discussion of whether moderate heat cement and Type II cement are "approximately equal in commercial value." 19 U.S.C. § 1677(16)(B)(iii) (1988). According to plaintiff, the statute requires that all three criteria contained in Section 1677(16)(B) be satisfied, including the requirement that the merchandise be "approximately equal in commercial value." 19 U.S.C. § 1677(16)(B)(iii) (1988). Plaintiff argues that since Commerce's final determination did not even address the third criteria of 1677(16)(B), Commerce's determination must be reversed.

In some cases the court will defer to Commerce's determination, but the court "cannot defer to a decision which is based on inadequate analysis or reasoning." *USX Corp. v. United States,* 11 CIT 82, 88, 655 F. Supp. 487 (1987). As the court has frequently noted, Commerce must set out the reasons for its determinations in sufficient detail to allow the reviewing court to discern the basis for its determination. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).

Because Commerce only addressed Section 1677(B)ii and failed to discuss the remaining two factors in its product comparison analysis, the court cannot determine whether its decision was supported by substantial evidence. Consequently, the court remands Commerce's decision and directs Commerce to articulate its determinations, with its underlying reasoning, regarding every element of 19 U.S.C. § 1677(16)(B) (1988). Because the court remands the case to Commerce on this basis, the court need not at this time address the arguments put forward by plaintiff that Commerce's "such or similar" determination was not supported by substantial evidence and otherwise not in accordance with the law.

B. *Adjustment Methodology:*

1. *Use of Annualized Fixed Costs to Calculate LSNW's Costs of Further Manufacturing:*

According to 19 U.S.C. § 1677a(e)(3) (1988), the exporter's sales price shall be reduced by:

> any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

In the case at bar Commerce used annualized fixed costs to calculate LSNW's cost of further manufacturing the imported cement into ready-mix, stating:

> We have examined the record and determined that LSNW's fixed costs are significant enough to affect the per metric ton cost of ready-mix when cement and concrete sales are seasonal in nature.

56 Fed. Reg. at 12165–12166.

Plaintiff Ad Hoc contends that basing the value added adjustment upon annual cost, rather than upon actual costs incurred during the POI, was contrary to the law and an abuse of discretion. Ad Hoc argues that because Commerce used annual cost data to calculate the United States value added deduction, the ESP was an annual averaged U.S. price. Ad Hoc argues that the U.S. price must be determined on a transaction-by-transaction basis and not on an averaged basis, which could potentially mask dumping.

The court begins its analysis by determining that the statutory language does not address the specific issue before us. However, "[a]s long

as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not * * * question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–405, 636 F. Supp. 961 (1986), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

The court deems that annualizing costs was a permissible method in the case at bar. Substantial evidence on the record supports Commerce's conclusion that LSNW's production of ready-mix was characterized by high fixed costs and seasonal swings in the level of capacity utilization. *See generally* P.R. 2–13 (Administrative Hearing Tr. at 62–65) (discussing the seasonal nature of the market and the high fixed costs of the ready-mix operations). At verification, Commerce documented that [     ] Commerce verified the company's calculation of annual costs of manufacturing (i.e. materials, labor and overhead). *Id.* at 24–31. Per unit costs were very low when the industry was operating at full capacity and very high when the industry had substantial unused capacity.

The court agrees with Commerce that given substantial evidence of high fixed costs and fluctuating capacity utilization as in the instant case, it is reasonable that the exporter can argue that costs computed on the basis of a seasonally low level of utilization are overstated. Conversely, plaintiff can argue that costs should not be allocated on the basis of a period of peak capacity utilization because such costs would be understated.

Furthermore, Commerce's method in the instant case of using annualized fixed costs on a transaction basis did not mask dumping, as claimed by Ad Hoc, as price averaging would. The court agrees with Commerce that calculating the price for each transaction using the same value added adjustment did not constitute "averaging" of the U.S. price. Commerce adeptly demonstrated the difference between averaging prices and making an adjustment based on average costs in the following example contained in its submissions:

> Assume there are three export sales to the [United States], each for one widget, with prices of $8, $12, and $16, respectively. The "average" U.S. price is $12 ($36/3). Use of the average price masks the price fluctuations, and could potentially mask dumping. In contrast, assume that each of those widgets is subject to further manufacture in the [United States]. For purposes of calculating ESP, the average cost of further manufacture in the [United States] is determined to be $2/widget. The ESP for each transaction would, therefore, be $6, $10, and $14, respectively.

Defendant's Memorandum in Partial Opposition at 35 n. 17.

Finally, the court finds that Commerce's methodology is consistent with its previous practice. When calculating a value, whether it be foreign market value, cost of production or United States value added, it is not unusual for Commerce to use average costs. Commerce thus measures costs for a period other than the POI when that will achieve a more

accurate estimate of actual costs of production. *See e.g., Cellular Mobile Telephones and Subassemblies From Japan,* 55 Fed. Reg. 29394 (1990) (final admin. review). (In calculating the United States value added, start-up costs for United States production were allocated over the projected life cycle of the product.)

The court, therefore, concludes that Commerce's approach was a reasonable exercise of its discretion based upon the facts in the instant case, and that its conclusion was supported by substantial evidence on the record.

### 2. *Movement Expenses:*

The court now addresses Ad Hoc's argument that Commerce's decision to deduct Onoda's and Nihon's pre-sale movement expenses from the foreign market price was not supported by substantial evidence and was otherwise not in accordance with the law.

Commerce is required to reduce the U.S. price by any expenses "incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States. * * *" 19 U.S.C. § 1677a(d)(2)(A) (1988). No corresponding provision exists with regard to foreign market value. Under 19 U.S.C. § 1677(b) (a)(4)(B) (1988), the foreign market value may, however, be adjusted for differences in the circumstances of sale. Commerce's implementing regulation requires in general a direct relationship between the expense and the particular sale at issue before the foreign market value may be adjusted. 19 C.F.R. § 353.56 (1992).

In its final determination, Commerce calculated foreign market value of cement sales based on ex-factory prices, stating that:

> because we deducted all pre- and post-sale movement expenses incurred in transporting the plant to the point of sale in calculating [U.S.] price, we determined that a fair price-to-price comparison requires a similar deduction to [foreign market value], consistent with the Department's policy. *See Red Raspberries From Canada,* 56 Fed. Reg. 677 (January 8, 1991) and *Gray Portland Cement and Clinker From Mexico,* 55 Reg. 29244, 29251 (July 18, 1990)).

56 Fed. Reg. at 12161

Plaintiff claims that Commerce's treatment of pre-sale movement expenses is not in accordance with the law. In support of its claim, Ad Hoc argues that Commerce has no inherent authority to create adjustments it feels are necessary to ensure a fair price comparison beyond those explicitly enumerated in the statute and regulations. Moreover, Ad Hoc claims that in allowing the adjustment for movement expenses incurred prior to the date of sale, Commerce is circumventing the circumstance of sale provision contained in the statute and regulation. Ad Hoc argues that Commerce has consistently found in determinations upheld by this court that only those expenses that are incurred after the date of sale of the subject merchandise are expenses directly related to sales.

Commerce concedes that it previously relied on the circumstance of sale provision in making movement adjustments to the foreign market value. Commerce also concedes that under its prior practice only expenses directly related to the subject sales are allowed. Yet, according to defendant, while Commerce's previous reliance on the circumstance of sale provision is one possible interpretation of the antidumping duty statute, it is not the only reasonable interpretation.

Defendant states that recently, Commerce changed its prior practice of relying on the circumstance of sale provision because it recognized that in some instances this approach led to inequitable results. Reliance on the circumstance of sale provision did not allow for an accurate comparison of similar merchandise at a similar point in the chain of trade. Commerce recognized that it was in fact in certain situations comparing an ex-factory price on the United States side with an ex-warehouse or an ex-silo price on the foreign market side.

Commerce, therefore, relying on *AOC International, Inc. v. United States,* 13 CIT 716, 721 F. Supp. 314 (1989) and *Smith-Corona* at 132, adopted a more flexible approach to ensure a fair price comparison in accordance with its statutory mandate as interpreted by the courts. Under this approach, Commerce starts out with the first sale to an unrelated purchaser both in the United States market and in the foreign market. From this point, Commerce then deducts movement expenses to achieve a price at a similar point in the chain of commerce. According to Commerce, since the law prescribes that it look at the ex-factory price of the merchandise packed for delivery to the United States, movement expense adjustments to the observed U.S. price or the observed foreign market value are made to the ex-factory level in order to arrive at this common point in the chain of commerce. (Defendant's Memorandum in Partial Opposition at 47–48.)

In reviewing Commerce's methodology in the instant case, the court must discern whether Commerce has correctly applied the adjustment provisions of the statute and regulation. In *Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* 16 CIT 115, 787 F. Supp. 208 (1992) ("Ad Hoc I") the court stated that:

> the absence of language addressing a movement deduction in the [foreign market value] statute suggests no hard and fast rule [regarding the treatment of such expenses] to the court in view of Congress' broad direction to make adjustments for differences in circumstances of sale and its lack of direction as to which exact price factors to use.

Ad Hoc at 212

The question of how to treat movement expenses thus falls into the category of issues that are not specifically addressed by the statute. In light of Congressional silence, *Chevron* directs the court to uphold Commerce's interpretation if it is reasonable within the context of the statutory purpose.

This court is not convinced by plaintiff's arguments. First, plaintiff's argument is internally contradictory. On the one hand, plaintiff denies Commerce's inherent authority to apply adjustments that it feels are necessary to achieve a fair price comparison. On the other hand, plaintiff recognizes Commerce's inherent authority to allow home market indirect selling expense deductions in ESP comparisons as long the amount is "capped" by those indirect expenses deducted from the U.S. price. 19 C.F.R. § 353.56(b)(2)(1992) (Plaintiff Ad Hoc's Memorandum in Support of its Motion for Judgment on the Agency Record at 34.)

More importantly, however, plaintiff's position ignores the purpose of the antidumping statute and Commerce's practice, which is to derive a foreign market value and a U.S. price at a comparable point in the stream of commerce. 19 U.S.C. § 1677a(d)-(e), 1677b(a) (1988). The Federal Circuit upheld Commerce's authority to make adjustments in order to arrive at what it has called an "apples with apples" price comparison in *Smith-Corona* at 132.

In *Zenith,* the Federal Circuit emphasized that the *Smith-Corona* decision is not applicable in situations where the Act expressly provides a more specific treatment of the issue. *Zenith* at 17. The court concludes that since the antidumping duty statute is silent with regard to the disparity created between foreign market value and U.S. price with respect to movement expenses, *Smith-Corona* is applicable.

Since Commerce may properly make an "apples with apples" comparison, the next issue Commerce faces when dealing with a specific expense such as movement expenses is how to measure the amount of expense to be deducted. *Torrington Co. v. United States,* No. 93–44 (CIT Mar. 29, 1993). Commerce must measure the expense beginning at a common point in the stream of commerce at which point foreign market merchandise and United States merchandise "have not yet been differentiated. * * *" *Id.* at 33. In the case at bar, Commerce determined that this point was at the factory gates.

The court finds nothing unreasonable with Commerce's measurement of presale movement expenses ex-factory provided Commerce acts consistently in making its measurements in regard to foreign market value and U.S. price. *See Torrington* at 32–33. (Citing *Smith-Corona,* the Court upheld Commerce's calculation of foreign market inventory carrying costs from the time of production rather than the date of shipment when comparing ESP sales to foreign market sales. The court reasoned that the baseline for comparison purposes was used consistently on both sides of the equation, thus ensuring a fair price comparison.)

Moreover, in the instant case Commerce's adjustment methodology was in accordance with its current practice.

Finally, Commerce's position was recently sustained by this court in a case on point, *Ad Hoc I*

In *Ad Hoc I,* one of the issues before the court was whether pre-sale movement expenses incurred on home market sales could be deducted in calculating the foreign market value when such a deduction was spe-

cifically provided for, by statute and regulation, when calculating U.S. price only. After evaluating the same argument as put forward by plaintiff's in the instant case regarding the lack of statutory or regulatory direction for this deduction from foreign market price, the court, relying on *Smith-Corona,* reasoned that Commerce's "primary goal [in light of Congressional silence] when generating [foreign market values] and [U.S.] prices for the purpose of a less than fair value determination is to compare 'apples to apples'". *Ad Hoc I* at 212 (citation omitted) (footnote omitted).

The court accepted Commerce's explanation that "to obtain an 'apples to apples' comparison, the ex-factory price in the United States should be compared to the ex-factory, not the ex-warehouse, price in the home market." *Ad Hoc I* at 213.

Plaintiff seeks to distinguish the case at bar from the facts in *Ad Hoc I* by arguing that in that action, pre-sale movement expenses were incurred in both the home market and the United States market. Considering the similarity of selling procedures in both markets in that case, a fair comparison required a deduction of movement expenses on both sides. Plaintiffs contend that according to Commerce's own finding, there were no movement expenses on the United States side in the present case. *See* Plaintiff Ad Hoc's Reply Brief at 17–18. Ad Hoc argues that this difference is critical and renders the holding of *Ad Hoc I* inapplicable.

The court disagrees with plaintiff. A review of the entire opinion in *Ad Hoc I* suggests to the court that the reasoning underlying that opinion is equally applicable in the case at bar. In both cases the methodology served the goal of obtaining a fair price comparison at a common point in the stream of commerce. In both cases the ex-factory point was chosen as the appropriate baseline for measuring the movement expenses. As long as Commerce is consistent in making its measurements in regard to foreign market and United States sales, the court can find nothing wrong with the present method of measuring movement expenses.

Therefore, based on the reasons stated, the court concludes that Commerce's deduction of all pre- and post-sale movement expenses when calculating foreign market value was permissible.

### 3. *Service Station Costs:*

The court now examines plaintiff Onoda's contention that Commerce's treatment of Onoda's expenses of operating its service stations in the home market as warehousing expenses was not based on substantial evidence and otherwise not in accordance with the law.

Pursuant to 19 U.S.C. § 1677b(4)(B) (1988), Commerce may adjust foreign market value to compensate for any differences between foreign market value and U.S. price caused by differences in circumstances of sales in the two markets. Pursuant to this provision, Commerce established the practice of adjusting for differences in warehousing ex-

418

penses.[3] *Brass Sheet and Strip from the Republic of Korea,* 51 Fed. Reg. 40833, 40834 (Dep't Comm. 1986) (final determination). Thus, whenever a difference in warehousing costs exists between a foreign market sale and a U.S. sale, Commerce makes a specific warehouse expense adjustment to foreign market account for the differences in circumstances of sales.

According to its final determination, Commerce classified Onoda's expenses incurred in the home market for service stations as warehouse expenses stating that:

> based on the nature of service station functions, and costs, we determined that these costs are more appropriately classified as warehousing expenses and, for Onoda, have treated them as indirect selling expenses for purposes of the final determination. *See Phosphoric Acid from Israel,* 52 FR 25440, 25442 (July 7, 1987).

56 Fed. Reg. at 12161.

For comparisons to ESP sales, Commerce made deductions for home market indirect selling expenses comprised of service station costs. The amount was capped by the amount of indirect selling expenses incurred on sales in the United States market, in accordance with Commerce's regulations. 19 C.F.R. § 353.56(b)(2) (1992). For ESP sales of ready-mix cement produced by Onoda's related importer after importation, Commerce computed the amount of the cap based on the portion of indirect selling expenses attributable to the subject merchandise. Commerce did not allow for any deductions in purchase price sales.

Onoda contends that service station charges incurred by Onoda in the home market should be treated as movement expenses and not as warehouse expenses. Alternatively, Onoda contends that, if the court finds that Commerce properly determined that the operating costs of Onoda's service stations were warehousing expenses, then these expenses should be treated as direct expenses, rather than as indirect expenses.

According to Onoda's understanding, "warehouses" are used to store a product before distribution to a customer. As support, Onoda cites *Webster's Ninth New Collegiate Dictionary,* 1328 (1988) which defines a warehouse as "a structure or room for the storage of merchandise or commodities."

Onoda contends that the service stations at issue were not used to store cement. In Onoda's view, this is demonstrated conclusively by the very short total inventory time experienced by Onoda in its home market sales.

While Onoda concedes that the cement was not physically moved while it was within the terminal itself, it does not consider this fact dispositive in the instant case. According to Onoda, the expenses qualify as movement expenses because the service stations were used as transfer

---

[3] Warehousing expenses generally encompass overhead, depreciation, and other expenses incurred in operating a warehouse.

points and as such were integral links in Onoda's home market distribution system.

Onoda argues that historically, Commerce and this court have taken a wide view of what constitutes a "movement" expense. Movement expenses are not just limited to the actual physical movement of a product, but also to all related expenses incurred incidental to the movement of the subject merchandise. Onoda concludes that the same principle applies equally in the present case.

Finally, Onoda argues that Commerce in its final determination erred in relying upon *Industrial Phosphoric Acid From Israel,* 52 Fed. Reg. 25440, 25442 (Dep't Comm. 1987) (final determination), to support its position. In that case, Commerce refused to allow as a movement expense expenses incurred by the respondent at its "storage facilities." Onoda claims that citing to that case begs the issue since the record in this case demonstrates that the service stations were not "storage facilities". Thus, according to Onoda, the *Industrial Phosphoric Acid* case is simply irrelevant to the present analysis.

Commerce rejected Onoda's claim that the expenses were movement expenses "based on the nature of service station functions, and costs." *(Gray Portland Cement & Clinker from Japan,* 56 Fed. Reg at 12161.) In support of its position, Commerce argues that the service stations were warehouses from which cement was sold from inventory to the end-user. (Defendant's Memorandum in Partial Opposition at 52–53.) Commerce claims that the fact that, in some instances, cement did not remain in the service stations for a long period of time before being shipped to a customer should be disregarded as irrelevant. (Defendant's Memorandum in Partial Opposition at 53.) Commerce furthermore argues that Onoda's distribution terminal costs included maintenance for the service stations and various overhead expenses, which are, according to Commerce, by their nature costs associated with operating a storage facility. (Defendant's Memorandum in Partial Opposition at 53.)

Finally, Commerce claims that the fact that Onoda's service stations are a component of Onoda's distribution system does not require Commerce to treat Onoda's service station costs as movement expenses. Relying on *Industrial Phosphoric Acid From Israel,* 52 Fed. Reg. 25440, 25442 (Dep't Comm. 1987) (final determination), Commerce contends that it has specifically rejected the treatment of warehousing expenses as movement expenses. Furthermore, in those cases in which pre-sale movement expenses were deducted from foreign market value, Commerce argues that it specifically stated that pre-sale movement expenses included only expenses related to transporting the merchandise from the factory to the warehouse. *See Red Raspberries From Canada;,* 56 Fed. Reg. 677 (Dep't Comm. 1990) (final results).

Before addressing the question of whether the decision by Commerce to classify the service stations as warehouses was not in accordance with the law and not supported by substantial evidence, the court determines

that the statute does not define either the term "movement expense" or "warehouse expense".

As previously noted, where the "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron* at 843.

Consequently, the court must determine whether Commerce's decision that the expenses in the instant case were warehousing expenses rather than movement expenses, as claimed by plaintiff Onoda, was a permissible construction of the statute as required under *Chevron.*

In reviewing Commerce's methodology, the court first notes that both the plain language of the statute and Commerce's practice support a wide interpretation of which charges qualify as movement expenses to include other expenses than freight expenses. As noted above, the statute requires Commerce to reduce purchase price or exporter's sales price by the amount, if any, included in such price, "*incident to bringing* the merchandise" to the place of delivery in the United States. 19 U.S.C. § 1677a(d)(2)(A) (1988) (emphasis added).

Furthermore, Commerce reduces the U.S. price by all amounts included in the observed price that are attributable to shipment of the merchandise from the foreign plant to the U.S. customer. These amounts can include, among other possible charges, foreign inland freight and insurance; foreign brokerage, handling and port charges; international freight (ocean, air, land) and insurance; U.S. Customs duties; U.S. brokerage, handling and port charges and U.S. inland freight and insurance. The foreign market price is similarly reduced by delivery costs included in the observed price. *See Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed. Reg. 18992, 19044 (Dep't Comm. 1989) (final determination). Thus, the fact that the service station expenses were not freight expenses does not in and of itself preclude them from being movement expenses.

Next, in determining whether Commerce's decision was reasonable the court notes that the legislative history does not contain a definition of the term "warehouse". In the light of such Congressional silence, the court may resort to extrinsic sources such as dictionaries and lexicons. *See Carlisle Tire & Rubber Co. v. United States,* 5 CIT 229, 233, 564 F. Supp. 834 (1983). The court notes that according to a standard dictionary definition, the plain meaning of the term "warehouse" is "a structure or room for the storage of merchandise". *Webster's New World International Dictionary* Unabridged 2576 (1986). The term "to store" is defined as "to put aside, or accumulate, for use when needed". *Webster's New World Dictionary* 1322 (3d College ed. 1988). Consequently, the court determines that a "warehousing expense" is an expense associated with putting aside merchandise in a structure or room for use when needed.

Based on the above, the court concludes that the subject expenses must be classified as warehousing expenses if the stations actually were being used to put aside cement for use when needed. If, on the other hand, the cement was merely residing in the service stations "incident to bringing" the cement from one location to another, the expenses must be considered as movement expenses. 19 U.S.C. § 1677a(d)(2)(A) (1988). *See also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany,* 54 Fed. Reg. 18992, 19044 (Dep't Comm. 1989) (final determination).

The court recalls that Commerce "is obligated to weigh all the pertinent evidence gathered in an investigation in reaching [its] determination" regarding the true nature of the service station expenses. *Roses, Inc. v. United States,* 13 CIT 662, 665, 720 F. Supp. 180 (1989) (citation omitted). Moreover, the agency must "'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *Burlington Truck Lines, Inc., v. United States,* 371 U.S. 156, 168 (1962) (quoting *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 197 (1941)).

Accordingly, Commerce's finding as to the proper classification of the service station expenses must be based on a substantive analysis of all the factors suggesting their true nature. Factors indicating the actual use of the facility in the present case, such as the type of facility, whether the facility was movable, i.e. had wheels, was a ship, the process the merchandise was undergoing, the length of time involved, as well as other factors must be taken into account. Only then will Commerce's analysis meet the test of "reasonableness" as required under *Chevron.*

In the instant case, Commerce, however, limited its discretion in an unreasonably rigid, mechanical manner, placing form over substance. Here Commerce only looked at factors that related narrowly to the facility itself, i.e. the nature of the facility and that the costs incurred were overhead costs. Commerce did not consider other relevant factors such as the length of time involved. Clearly, the court cannot condone such a narrow analysis. The court "cannot defer to a decision which is based on inadequate analysis or reasoning." *USX Corp. v. United States,* 11 CIT 82, 88, 655 F. Supp. 487 (1987).

By adopting this limited approach, Commerce failed to realize the overriding statutory purpose which is to achieve a fair price comparison based on the peculiarities of the industry under investigation. *Smith-Corona* at 132. *See also Zenith.* Furthermore, since the result of Commerce's analysis was determinative of whether a deduction of the expenses would be allowed in full or only up to the ESP cap, its treatment of the service station expenses had a potentially significant impact on the fair value calculation.

It is the court's view that several factors contained in the administrative record indicate that the service stations might in reality have functioned as transfer points rather than as warehouses for storing cement in this particular case.

First, due to the fact that Onoda's home market was made up of many islands and that production and demand were geographically dispersed, Onoda used a combination of sea and land transportation to move its cement. Next, the fact that cement and clinker have a low weight-to-value ratio meant that a combination of sea and land transportation would reduce Onoda's transportation expenses, making its cement more competitive. P.R. 2–13 (Administrative Hearing Tr. at 44).

Onoda's use of a combination of different modes of transportation to move cement meant that the cement had to be transferred from ship to rail or truck. The service stations might have been such transfer points.

Plaintiff, Ad Hoc concedes that portland cement is hygroscopic, that is very sensitive to contact with water. Because gray portland cement and water form concrete, gray portland cement must be handled and stored in a manner which minimizes the possibility of contamination by water. Thus, both domestic producers and importers must use some type of enclosed system or storage silo and relatively sophisticated equipment to store and transport gray portland cement. P.R. 1–13 (Petition at 13).

The court finds that the fact that the cement was generally sold in bulk even though it is very sensitive to contact with water indicates that very careful handling was required during the transfer process from ship to rail or truck. Use of a separate facility such as the service station during the transfer process might indeed under such circumstances have been necessary and incident to moving the merchandise.

Finally, although the record is not conclusive as to the actual amount of time the cement spent in the facilities, it is clear that the time was very short P.R. 2–13 (Administrative Hearing Tr. at 48). This indicates that the level of cement production was carefully geared to meet the actual level of demand, and that cement was therefore moved through the service stations on a continuous basis and not stored awaiting sale to the end user. *Id.*

Based on the above reasoning, the court concludes that Commerce's determination was not reasonable and therefore not in accordance with the law. The court remands the determination to Commerce with instructions to conduct a substantive investigation as to whether the service stations acted as warehouses or transportation facilities. In this analysis, Commerce is directed to evaluate why the merchandise resided in the service stations based on all the relevant factors present, including the time involved. Having remanded on the basis of plaintiff's first argument, the court does not reach Onoda's alternative argument that if the service station expenses are viewed as "warehouses", such pre-sale warehousing expenses should be deducted as a direct circumstance of sale adjustment.

4. *Interest Payments in Calculating LSNW (Onoda) Value Added Costs of Further Manufacturing:*

The court will now examine plaintiff Onoda's contention that Commerce incorrectly [          ].

Title 19 of the United States Code, Section 1677a(e)(3) (1988) provides that the exporter's sales price be reduced by:

> any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

To comply with this provision of the Code, Commerce must calculate the cost of production for further manufactured merchandise and deduct that amount from the ESP. The cost of production includes the cost of manufacturing as well as general expenses, including [        ]. This methodology is in accordance with Commerce's administrative practice.

When calculating dumping margins, all parties agree that the U.S. price for LSNW's cement imports is properly calculated by using the ESP, the price to the first unrelated purchaser.

In its final determination, Commerce concluded that [      ] should be included in the calculation of LSNW's costs of further manufacturing cement purchased from Onoda. Consequently, it deducted these expenses from the U.S. price according to 19 U.S.C. § 1677a(e)(3), stating that:

> we agree with petitioners. Interest paid on all loans has been included in calculation of U.S. value added costs because the Department recognizes the fungible nature of financing.

56 Fed. Reg. at 12166.

Onoda contends that Commerce incorrectly included [         ]

In support of its claim, Onoda argues that it is Commerce's general practice not to allow an offset for interest income which is received from activities unrelated to the manufacturing process or business activity under investigation. [          ]. Onoda relies on *Sweaters Wholly or in Chief Weight of Man-Made Fiber From the Republic of Korea,* 55 Fed. Reg. 32,659 (Dep't Comm. 1990) (final determination), where Commerce excluded a respondent's interest expenses incurred for financing activities which were distinct from its manufacturing operation. Onoda also cites to *Certain Fresh Cut Flowers From Colombia,* 56 Fed. Reg. 50554, (Dep't Comm. 1991) (final admin. review) in which Commerce allowed the exclusion of costs unrelated to the selling activities of the subject merchandise.

Commerce, however, argues that pursuant to its administrative practice, such [      ] are included in the calculation of G&A expenses when calculating further manufacturing costs due to the fungible nature of financing and the impossibility of accurately tracing the exact source and use of all funds held by a corporation. As a result, Commerce analyzed total [         ] relative to total cost of goods sold.

Furthermore, Commerce argues that the facts on the record clearly show [        ]

The court first determines that the statute does not provide a definition of the interest expenses to be included for the purpose of the value added calculation. The court must thus once again turn to *Chevron* and determine whether "the agency's answer is based on a permissible construction of the statute." *Chevron,* at 843.

The court finds that Onoda has failed to provide any legal, legislative or factual support for its argument that the court should disregard long settled Commerce practice and require Commerce to exclude the [       ] incurred. First, it is not Commerce's practice to trace the use of a corporation's funds because of the fungible nature of a corporation's financial resources. *See Titanium Sponge From Japan,* 55 Fed. Reg. 42,227 (Dep't Comm. 1990) (final admin. review); *Certain Small Business Telephone Systems,* 54 Fed. Reg. at 53,152; *Antifriction Bearings,* 54 Fed. Reg. at 19075.

· Second, even if Commerce were required to consider certain [       ] separately from LSNW's other [       ]

The court is not persuaded by Onoda that Commerce is required by administrative precedent to exclude from its value added calculation the [       ] attributable to the loans in question. The circumstances of the parties involved in the cases cited by Onoda are distinguishable from the facts of the instant case. The parties in *Flowers from Colombia, Titanium Sponge* and *Sweaters From Korea* were all involved in lines of business that were clearly unrelated to those under review by Commerce. Plaintiff's reliance on these cases is thus misplaced.

The court, therefore, concludes that Commerce's methodology is a permissible application of the statute, and supported by substantial evidence and sustains its determination in this regard.

## C. *Use of Best Information Available:*

Finally, plaintiff Nihon challenges Commerce's reliance upon BIA in its calculation of Nihon's dumping margin. Nihon initially argues that Commerce's decision to collapse Nihon with Ryukyu, Myojo and Daiichi because of a possibility of price manipulation by plaintiff in collaboration with its related producers was not based on substantial evidence and was not a determination based upon the facts. Plaintiff also contends that the information chosen by Commerce as BIA was improper. The court, however, does not reach this second issue because the court remands on the first issue.

In this case, Commerce based its decision to collapse the entities and use BIA for purposes of determining sales quantities and values for Myojo and Daiichi upon Nihon's failure to submit a consolidated response with information concerning Myojo and Daiichi. Commerce also contends that it was unable to verify the information that was submitted.

Plaintiff asserts that Nihon was excused from submitting a consolidated response including Myojo and Daiichi sales data because Nihon, Daiichi and Myojo were separate legal entities, and data related to

Daiichi and Myojo was unavailable to plaintiff. Consequently, Commerce should not have resorted to BIA when calculating Nihon's, Daiichi's and Myojo's dumping margins.

In support of their contention, plaintiff relies upon *Olympic Adhesives, Inc. v. United States,* 8 Fed. Cir. (T) 69, 899 F.2d 1565 (1990). In *Olympic,* the respondent did not provide all the data sought by Commerce in its questionnaire because the requested data did not exist. Commerce characterized this response as a refusal to provide the requested data and relied upon BIA. The Court of Appeals for the Federal Circuit held that use of BIA was not justified simply because the respondent's full and complete answers to Commerce's questionnaire did not "definitely resolve the overall issue presented." *Id.* at 1574.

"However, plaintiff's reliance on *Olympic* rests upon the assumption that the information sought by Commerce was unavailable to plaintiffs because [Nihon, Daiichi and Myojo] were in fact separate legal entities." *Tianjin Machinery Import & Export Corp. v. United States,* 16 CIT at 934, 806 F. Supp. 1008, 1013. The court's first inquiry must therefore be whether substantial evidence supports Commerce's determination that plaintiff was not independent from Daiichi and Myojo.

"It is the Department's general practice *not* to collapse related parties except in certain relatively unusual situations, where the type and degree of relationship is so significant that we find there is a strong possibility of price manipulation." *Antifriction Bearings (Other than Tapered Bearings) and Parts Thereof from the Federal Republic of Germany,* 54 Fed. Reg. 18992, 19089 (1989) (final determination) (citation omitted).

In determining whether to collapse entities, Commerce does not focus solely upon the degree of voting control one company may have over another, but upon a broad analysis of the facts in the case. In addition, as Commerce stated in *Cellular Mobile Telephones And Subassemblies from Japan,* its determination to collapse related entities is not "based solely on the extent of their financial relationship." 54 Fed. Reg. 48011, 48015 (Dep't Comm. 1989) (final admin. review). Other factors relied upon by Commerce in collapsing related companies are that (1) the companies are closely intertwined; (2) transactions take place between the companies; (3) the companies have similar types of production equipment, such that it could be unnecessary to retool either plant's facilities before implementing a decision to restructure either company's manufacturing priorities; and (4) the companies involved are capable, through their sales and production operations, of manipulating prices or affecting production decisions. *Certain Granite Products from Spain,* 53 Fed. Reg. 24335, 24337 (Dep't Comm. 1988) (final determination); *Certain Granite Products from Italy,* 53 Fed. Reg. 27187, 27189 (Dep't Comm. 1988) (final determination); *Steel Wheels from Brazil,* 54 Fed. Reg. 8780, 8781 (Dep't Comm. 1989) (prelim. determination). All of these factors need not be present as long as the parties are sufficiently related to present the possibility of price manipulation. *Cellular Mobile*

*Telephones and Subassemblies from Japan,* 54 Fed. Reg. 48011, 48015 (Dep't Comm. 1989) (final admin. review).

Here, in its final determination, Commerce stated:

> it is clear that Nihon controls a substantial interest in Myojo and Daiichi, [and thus] we determine that there is a reasonable basis to believe that collapsing Nihon and its related parties Myojo and Daiichi is warranted.

56 Fed. Reg. 12167

Although Commerce concedes that its determination to collapse all three entities had to be based on the standards set forth above, the final determination does not contain any information as to why it was "clear" to Commerce that "Nihon controls a substantial interest in Myojo and Daiichi." It does not explain why there was a "reasonable basis to believe that collapsing Nihon and its related parties Myojo and Daiichi [was] warranted." The determination does not indicate the criteria or the evidence relied upon in reaching such a conclusion.

The court finds it important to emphasize that an agency "must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). The agency "must articulate [a] rational connection between the facts found and the choice made." *Id.* at 168. Any determination that the use of BIA was appropriate must therefore contain findings that the parties are sufficiently related to present the possibility of price manipulation based on the criteria developed in Commerce's practice.

Commerce's determination, however, failed to include any discussion or evidence whatsoever showing that (1) the companies were closely intertwined; (2) transactions took place between the companies; (3) the companies had similar types of production equipment, such that it would be unnecessary to retool either plant's facilities before implementing a decision to restructure either company's manufacturing priorities; and (4) the companies involved were capable, through their sales and production operations, of manipulating prices or affecting production decisions. While each of these criteria did not have to be met, Commerce did have to consider them all. *See Cellular Mobile Telephones and Subassemblies from Japan,* 54 Fed. Reg. 48011, 48015; *Certain Granite Products from Spain,* 53 Fed. Reg. 24335, 24337; *Certain Granite Products from Italy,* 53 Fed. Reg. 27187, 27189; *Steel Wheels from Brazil,* 54 Fed. Reg. 8780, 8781.

Additionally, the court independently examined the administrative record in the case at bar. The record contained some evidence of control by Nihon based upon Nihon's ownership interest in the two related companies and the fact that Nihon's and Myojo's board of directors had overlapping membership. However, the record did not include the breadth of information necessary to conclude that this was one of those "relatively unusual situations, where the type and degree of relationship is so significant that we find there is a strong possibility of price

manipulation." *Antifriction Bearings (Other Than Tapered Bearings) And Parts Thereof from the Federal Republic of Germany,* 54 Fed. Reg. 18992, 19089 (Dep't Comm. 1989) (final determination) (citation omitted).

Indeed, evidence on the record did not indicate that the firms shared marketing information or production decisions. There was no indication of an intertwined management structure as was present in other cases where Commerce collapsed related entities. The fact that Myojo, Daiichi and Nihon sold their cement through a joint sales company, Daichon Distribution Company, did not in and of itself support that the companies shared information. Neither did the fact that Nihon got commissions on the sales of Myojo and Daiichi cement in and of itself support collapsing the entities.

As argued by plaintiff Nihon, evidence on the record supports that Nihon, Daiichi and Myojo were competitors. The record contains information that had the companies shared information, they would have been subject to antitrust actions in Japan. (Plaintiff Nihon's Memorandum in Support of its Motion for Judgment on the Agency Record at 10.) Furthermore, the record includes information [        ] (Plaintiff Nihon's Memorandum in Support of its Motion for Judgment on the Agency Record at 13.)

Therefore, the court finds that the record does not establish that there is substantial evidence to support collapsing Nihon and its related companies. Commerce's margin determination is therefore remanded for recalculation. In doing so, Commerce is instructed to recalculate the margin for Nihon without including Daiichi and Myojo.

### CONCLUSION

For the reasons provided above, this court holds that Commerce's final determination regarding gray portland cement and cement clinker from Japan was, in part supported by substantial evidence and in accordance with law, and, in part, was not based upon substantial evidence and not in accordance with the law, and remands to Commerce as to those relevant parts. Accordingly, Commerce's determination is sustained in part and plaintiffs' motions for remand are granted in part.